IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 19, 2007 Session

# TENNIE MARTIN and ROYA MITCHELL, Co-Personal Representatives of the Estate of KATHRYN L. MARTIN, deceased, and TENNIE MARTIN and ROYA MITCHELL, Individually, as next-of-kin and heirs-at-law of KATHRYN L. MARTIN, deceased, et al., v. NORFOLK SOUTHERN RAILWAY COMPANY and ANTHONY D. WORLEY

Direct Appeal from the Circuit Court for Anderson County
No. A2LA0325    Hon. Donald R. Elledge, Circuit Judge

―――――――――――

No. E2006-01021-COA-R3-CV  - FILED JULY 6, 2007

―――――――――――

Decedent's vehicle was struck by defendants' train at a railroad crossing, resulting in decedent's death.  The Trial Court granted Defendants' Summary Judgment.  The Estate has appealed.  We affirm the Trial Court's Judgment.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the court, in which D. MICHAEL SWINEY, J., joined, and CHARLES D. SUSANO, JR., J., dissented and filed an opinion.

Donald Capparella and Amy J. Jarrar, Nashville, Tennessee, and J.D. Lee, Knoxville, Tennessee, for appellants.

John W. Baker, Jr., and Emily H. Thompson, Knoxville, Tennessee, for appellees.

**OPINION**

In this wrongful death action, plaintiffs alleged, that on May 12, 2002, the deceased came to a railroad crossing on Marlow Circle in Clinton and stopped to look, then proceeded across, when her vehicle was struck by a train operated by Anthony Worley.  Plaintiffs charged that Worley failed to travel at a safe speed, failed to sound adequate warning upon approaching the crossing, and

failed to stop the train when he knew a collision was imminent.

Plaintiffs asserted that Norfolk Southern ("NSR") was guilty of failing to install lights and gates at the crossing, allowing brush and trees to grow in the right-of-way, obstructing visibility, and allowing its employees to fail to give whistle warnings, allowing its trains to be operated at excessive speeds, failing to train its employees regarding safety, etc. Defendants filed an Answer denying all liability, and asserting that decedent was completely at fault because she drove her vehicle directly into the path of the train, which they asserted was highly visible if she had only looked, and that decedent's negligence was the sole cause of the accident.

Ultimately, a Motion for Summary Judgment was filed by defendants, charging that deceased was at least 50% at fault for the accident, as she failed "to take the opportunity to observe the obvious presence of the train".

Attached to the Motion were excerpts from the deposition of Danny Martin, the conductor of the train, who testified that when approaching the crossing in question from the south, in the train, one could see the crossing for a good distance, and definitely one could see it from the whistle board. He testified that he went to the crossing after the accident and observed that a motorist could see down the track, probably as far as the operator of the train could. He testified that he saw decedent's truck bumper and hood before the collision, from about 400 feet away, and it was stopped. He said he saw the vehicle just as he came around the curve and entered the straightaway, and there were no obstructions to his visibility of the vehicle. He concluded that a motorist would have at least 1000 feet of sight distance from the crossing.

He testified that when he first saw decedent's vehicle, she had stopped short of the storage track, and he could see her hood and bumper from about 400 feet away, and that he told Worley there was a vehicle at the crossing, but he saw no danger in that she had stopped before the track. He saw her vehicle move and then stop again, just across the storage track, and that just as they got to the crossing, he saw the vehicle start to move again, but "by that time we were already at impact." Further that the train, at the time of impact, was traveling 32-33 miles per hour.

Defendant also attached excerpts from the deposition of Charles Manning, Ph.D., who testified that he had gone to the crossing in question, and that when one got to within 15-20 feet of the main rail, there was "tremendous" visibility, and one could see 900-1000 feet down the track. He testified that he could hear a train coming for 29 seconds, and could hear the whistle blow from beyond the whistle post. Further, that the decedent would have had 9 1/4 seconds of clear visibility of the train within which to react.

Also attached to the Motion was the deposition of Andrew Worley, and he testified that it was his duty to watch for obstructions on the track, but a vehicle sitting at a crossing but not on the track would not be considered an obstruction. He testified that the train was traveling at 32-33 miles per hour when the accident occurred, and that he had the train in idle. He was of the opinion that one in the train could see the crossing from 900-1000 feet back. Worley explained that the train

had 101 loaded cars, three engines on the head end, and two "pusher" engines. He testified he could not see decedent's vehicle from where he was sitting, because he could only see the left side of the engine, and that he blew the whistle upon approach to the crossing, and that the train's headlights were on bright, and the ditch lights were on as well. Defendants also attached excerpts from the deposition of Teddy Martin, decedent's husband, and he testified that he had conversations with his wife about the crossing being unsafe, and that he had also heard people talk about the fact that the train did not blow its whistle when approaching the crossing on occasions before the accident. He testified that when he rode with his wife and she crossed this crossing, she would stop, look both ways, and roll down the window to look for a train, and that she had no problems with her hearing he was aware of, and she was 45 years old when the accident occurred.

Excerpts from other depositions, as well as affidavits were attached to the Motion.. Among the affidavits was one of Dr. Charles Manning, who stated that for the train to have arrived at the crossing less than one second later, the crew would have had to perceive the obstruction and reacted 16 seconds earlier, and that decedent's vehicle would not have been at the crossing, so it could not have been perceived as a hazard.

Plaintiffs Responded to the Motion and filed an excerpt from the deposition of Cecil Smith, the eyewitness, wherein he stated he did not hear the train blow its whistle on the day in question. Plaintiffs attached certain corporate policies of the defendant railroad, and attached excerpts from the deposition of Danny Martin, who testified he first saw decedent's vehicle when the train was about 400 feet away from the crossing. He testified he was sitting in the back seat so that he could talk to the engineer because of the way the console was made, and the emergency brake was closer to the engineer. He testified that if he were sitting in the front seat, he could have reached the emergency brake more easily, but he would not have been able to see or talk to the engineer.

He testified that when he first saw decedent's vehicle, she was stopped before the spur track, then she moved forward and stopped before the main track. Martin testified that he "barely caught" movement from decedent's vehicle right before the collision. He testified there were no obstructions that would have prevented the decedent from seeing the oncoming train. Plaintiffs also attached the Statement of Train and Engine Crews which was completed by Martin on the day of the accident, wherein he marked that decedent had "stopped, then proceeded" through the crossing. Also attached was the drawing made by Martin, which shows where the decedent stopped her vehicle.

Other excerpts from depositions were also attached by the plaintiffs, as well as the deposition of the plaintiffs' expert, Dr. Kenneth Heathington, who testified that if a person stopped 15 feet from the main rail, they would have a good view down the track for a long distance, but that no one should stop there because it would be illegal to do so. He testified that if a person stopped their vehicle 15 feet from the storage track, they could only see 235 feet down the track. Dr. Heathington said that at that point, the train would be about 4.9 seconds away. Dr. Heathington's affidavit was also attached, which that a motorist approaching from the direction of decedent would be "essentially blind" in attempting to cross the track, and that trees and vegetation within the railroad right-of-way obstructed the motorist's vision such that the motorist would not have time to

react and stop. He said that when decedent stopped short of the storage track, she could see for 300 feet, but the train was 400 feet away, and that once she left that position and moved forward, "the time and space for Ms. Martin to perceive, interpret, evaluate, and perform relative to the approaching train was not sufficient to avoid the collision. This is why it is so critical that an adequate warning is provided the motor vehicle operator."

The Trial Court entered an Order Granting the Motion for Summary Judgment, and incorporated its Memorandum Opinion by reference.

In its Memorandum Opinion, the Trial Court found that Martin saw the deceased from at least 400 feet away, and that deceased had the opportunity to see the train from at least 300 feet away. The Trial Court stated that "as an old football player, that is the length of a football field." The Court said that the Gibbs and Worley testified that the train horn was blown, but whether it was blown or not, the headlights and ditch lights were on and operating. The Court found the train was traveling no more than 33 miles per hour, which was less than the speed limit for that area, and that the proof showed the decedent stopped twice, and that it took it over a minute to stop the train once the emergency brake was applied.

The court further noted that "some alleged factual disputes" would not defeat an otherwise properly supported motion for summary judgment, that the evidence was undisputed that decedent had the opportunity to see the train from at least a football field away, and that under *Eaton v. McLain*, decedent would be found at least 50% at fault, because if she had remained stopped and had looked, there was no question that she reasonably could have seen the train. The Court found that decedent was familiar with the crossing, and knew she should stop and look and listen, but failed to do so. Further the Court found the vegetation did not cause the accident, but the cause was decedent's failure to reasonably utilize her stop.

These issues are raised on appeal:

1.      Whether the Trial Court erred in granting summary judgment to defendants, when there were issues of fact regarding where and how many times Ms. Martin stopped her vehicle, whether the train blew its whistle, whether her sight was obstructed by trees/vegetation, and whether a sight line of 300 feet was enough?

2.      Whether the Trial Court erred in granting defendants' motion in limine regarding subsequent remedial measures?

The Supreme Court has set forth standards applicable when appellate courts are reviewing a motion for summary judgment. *See Blair v. West Town Mall,* 130 S.W.3d 761 (Tenn. 2004). In *Blair*, the Court said:

The standards governing an appellate court's review of a motion for summary

judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tennessee Rule of Civil Procedure 56 have been met. Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: 1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and 2) the moving party is entitled to a judgment as a matter of law on the undisputed facts.

\* \* \*

When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact.

To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. If the moving party fails to negate a claimed basis for the suit, the non-moving party's burden to produce evidence establishing the existence of a genuine issue for trial is not triggered and the motion for summary judgment must fail. If the moving party successfully negates a claimed basis for the action, the non-moving party may not simply rest upon the pleadings, but must offer proof to establish the existence of the essential elements of the claim.

*Blair*, 130 S.W.3d at 763-764, 767 (citations omitted).

The Supreme Court has also instructed regarding assessing the evidence when dealing with a motion for summary judgment:

The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion.

*Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)(citations omitted).

We have also recognized:

The summary judgment process is designed to promote efficiency in the judicial system, to enable the trial court to "pierce the pleadings to determine whether the case justifies the time and expense of a trial." Courts at every level must exercise

-5-

great care to not allow summary judgment to substitute for the trial of material factual issues.

* * *

The concept of materiality is pivotal;  the focus should be limited to only those facts that are material.  Material facts are those which are indispensable to the resolution of a claim or defense.

*Shearon v. Seaman*, 198 S.W.3d 209, 213-214 (Tenn. Ct. App. 2005)(citations omitted).

On the facts of the issues raised by plaintiffs, they argue that the facts were disputed and material, and thus precluded summary judgment.

As to materiality, the Supreme Court has explained:

A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed.  Therefore, when confronted with a disputed fact, the court must examine the elements of the claim or defense at issue in the motion to determine whether the resolution of that fact will effect the disposition of any of those claims or defenses.  By this process, courts and litigants can ascertain which issues are dispositive of the case, thus rendering other disputed facts immaterial.

Third, when the evidence or proof in support of or in opposition to a summary judgment motion establishes a disputed fact, and the fact is material, as we have defined that term, the court must then determine whether the disputed material fact creates a genuine issue within the meaning of Rule 56.03.   Proceeding from the premise that Rule 56 is intended to avoid unnecessary trials, the test for a "genuine issue" is whether a reasonable jury could legitimately resolve that fact in favor of one side or the other.  If the answer is yes, summary judgment is inappropriate;  if the answer is no, summary judgment is proper because a trial would be pointless as there would be nothing for the jury to do and the judge need only apply the law to resolve the case.  In making this determination, the court is to view the evidence in a light favorable to the nonmoving party and allow all reasonable inferences in his favor. And, again, "genuine issue" as used in Rule 56.03 refers to disputed, material facts and does not include mere legal conclusions to be drawn from those facts.

*Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993).

In this case, there are disputed facts, and in order to create a genuine issue for trial, such facts must be material. Plaintiffs argue that these disputed facts are material because, for example, if, where, and how many times decedent stopped would affect how far she could ultimately

see down the track, and how far decedent could see the train is material to the outcome of the case. Viewing the evidence in the light most favorable to plaintiffs, however, even if decedent only stopped once, or was "creeping" over the crossing, the undisputed evidence shows she would still have had an unobstructed sight distance of at least 300 feet, as concluded by the plaintiffs' expert, Dr. Heathington. Dr. Heathington repeatedly testified via his deposition and his affidavit that decedent would have a distance of at least 300 feet (a football field as he characterized it) within which to see the train if she stopped at the storage track.[1] While defendants' expert and others testified that decedent would have considerably greater sight distance, especially if she had stopped between the storage track and the main track, as Conductor Martin testified she did, the undisputed proof in the light most favorable to plaintiffs was that decedent's sight distance would have been at least 300 feet, and this is the basis of the Trial Court's determination. Accordingly, there is no genuine dispute of material fact regarding the decedent's sight distance, nor how many times she stopped, as the proof is undisputed that she could see for at least 300 feet down the track even if she had only stopped at the storage track.

Plaintiffs also argue there is a genuine dispute of material fact regarding whether the train blew its whistle. Plaintiffs correctly note that while the train engineer testified that he blew the whistle, and two residents who lived nearby testified they heard it blow, there was a witness to the accident, Cecil Smith, who testified that he did not hear it. Plaintiffs argue this fact is material because if the train whistle did not blow, it is a violation of statute and shows that NSR is guilty of negligence *per se.* Tenn. Code Ann. § 65-12-108, states:

> In order to prevent accidents upon railroads, the following precautions shall be observed:
>
> (1) The officials having jurisdiction over every public road crossed by a railroad shall place at each crossing a sign, marked as provided by § 65-11-105. The county legislative body shall appropriate money to defray the expenses of the signs. The failure of any engine driver to blow the whistle or ring the bell at any public crossing so designated by either the railroad company or the public official shall constitute negligence with the effect and all as set forth in § 65-12-109;
>
> (2) On approaching every crossing so distinguished, the whistle or bell of the locomotive shall be sounded at the distance of one fourth ( 1/4) of a mile from the crossing, and at short intervals until the train has passed the crossing;
>
> (3) Every railroad company shall keep the engineer, fireman, or some other person upon the locomotive, always upon the lookout ahead; and when any person, animal, or other obstruction appears upon the road, the alarm whistle shall be sounded, the

---

[1] Dr. Heathington conceded that decedent would have a much greater sight distance had she stopped past the storage track but short of the main track, but argued that to do so was unreasonably dangerous.

brakes put down, and every possible means employed to stop the train and prevent an accident;  and

(4) It is unlawful for any person operating a railroad to use road engines without having them equipped with an electric light placed on the rear of the engine, tank, or tender, which light shall be a bull's eye lens of not less than four inches (4''') in diameter with a bulb of not less than sixty (60) watts power, so that such road engine can be operated with safety when backing and the light so placed shall be burning while any such engine may be used in any backing movement.  Such lights shall be operated at night;  and any person violating any of these provisions shall be fined the sum of not less than twenty-five dollars ($25.00), and not more than one hundred dollars ($100), for each offense.

Plaintiffs contend that if the train did not blow its whistle upon approaching the crossing, it would be a violation of this statute and negligence *per se.*  Tenn. Code Ann. §65-12-109 states, however, "A violation of any of the provisions of § 65-12-108 by any railroad company constitutes negligence *per se* and in the trial of any causes involving § 65-12-108, the burden of proof, the issue of proximate cause, and the issue of contributory negligence shall be tried and be applied in the same manner and with the same effect as in the trial of other negligence actions under the common law in Tennessee."  Thus, even if the train's whistle did not blow and there was a violation of the statute, constituting negligence *per se*, this would not change plaintiffs' burden of proof, nor the issue of proximate cause, nor does it affect decedent's comparative fault.  Since the Trial Court decided this case based upon the determination that decedent's sight distance was sufficient and that she failed to reasonably avoid the accident by looking for the train, the issue of whether the train whistle blew or not is ultimately not material, and does not create a genuine issue for trial.

It is undisputed that decedent had a duty to stop at the crossing, and yield to any oncoming trains.  This duty has been established both by case law and statute.  Tenn. Code Ann. §55-8-145 states:

(a) Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances stated in this section, the driver of such vehicle shall stop within fifty feet (50') but not less than fifteen feet (15') from the nearest rail of such railroad, and shall not proceed until that driver can do so safely.  The foregoing requirements shall apply when:

(1) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;

(2) A crossing gate is lowered or when a human flagger gives or continues to give a signal of the approach or passage of a railroad train;

-8-

(3) A railroad train approaching within approximately one thousand five hundred feet (1,500') of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard; and

(4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.

(b) No person shall drive any vehicle through, around or under any crossing gate or barrier at a railroad crossing while such gate or barrier is closed or is being opened or closed.

(c) A violation of this section is a Class C misdemeanor.

The undisputed facts establish that the train was plainly visible and in hazardous proximity to the crossing when decedent proceeded to cross the railroad track, or it would not have struck her vehicle. Decedent should not have proceeded across the track until ensuring that it was safe to do so.

Pre-comparative negligence cases have observed:

The rule that it is negligence *per se* to enter upon a railroad track without looking or listening has been applied to the ordinary case in which the plaintiff, or the deceased, was not prevented from seeing or hearing by any other circumstances, and had the use of his faculties. In such case an ordinarily prudent man is deemed, under the law, to be guilty of such negligence as would bar a recovery if he entered upon the track without doing so.

*Hurt v. Yazoo & M.V.R. Co.*, 205 S.W. 437, 442 (Tenn. 1918). In *Cincinnati, N.O. & T.P. RY. v. Garrett*, 154 S.W.2d 435 (Tenn. Ct. App. 1941), we observed that where the decedent was familiar with the crossing, yet proceeded across when a train was too close and was hit:

[Decedent] was absorbed in thought apparently, and took no precautions whatever for his own safety; he left an island of safety and drove upon the track immediately in front of a fast approaching train, without looking or attempting to stop before he entered upon the track, seemingly unaware of the danger. What facts are there to excuse him from this negligent conduct, making the question of his contributory negligence one for the jury? . . . It is negligence for one to rely absolutely upon a warning given by the approaching train as a means of protection when entering upon a track, and if he relied upon the absence of a warning without using his faculty of sight and of due caution before entering upon the track, he was negligent, notwithstanding no warning was given.

*Id.* at 442. Similarly, in *Maxwell v. Western-Atlantic Railroad Company*, 295 F. Supp. 740 (E. D. Tenn. 1967), the District Court observed:

> When viewing the evidence in the present case in its most favorable light unto the plaintiff, the Court is of the opinion that, in accordance with Tennessee law as set forth in the foregoing opinions, the plaintiffs' decedent must be found to have been guilty of proximate contributory negligence as a matter of law. Reasonable minds could reach no other conclusion but that Mr. Maxwell had ample opportunity to observe the approaching train and either failed to look, or having looked failed to see the imminent danger.

*Id.* at 747. The District Court went on to note that decedent was familiar with the crossing, that the accident occurred during daylight hours, that there was no obstruction of his view of the track, and that the train was obviously in close proximity when he pulled in front of it or it would not have hit him, thus demonstrating that he could clearly have seen it if he had looked. *Id.*, *see also Newport v. Cincinnati, N.O. & T.P. RY.*, 509 F.2d 1246 (6th Cir. 1975); *Cox v. CSX Trans., Inc.*, 1989 WL 119375 (6th Cir. 1989).

In sum, it is undisputed that decedent herein was familiar with the crossing at issue, that the accident occurred during daylight hours on a clear and sunny day, that she had an unobstructed view up the track for at least 300 feet, and that the train was dangerously close when she crossed, thereby showing that she could have easily seen the train had she looked. As the aforementioned cases demonstrate, reasonable minds could not differ as to decedent's obvious negligence in proceeding across the train track when the train was close enough to hit her, and the Trial Court properly granted summary judgment on this issue. As to comparative fault, decedent was the only person in a position to avoid the accident, as the undisputed evidence was the train could not have slowed enough or stopped in sufficient time to avoid the decedent's vehicle when she pulled upon the crossing in the conductor's line of vision. She had a duty to yield to the clearly visible train, and her negligence was the proximate cause of the accident, thereby establishing a proper basis for the Trial Court's Summary Judgment, which we affirm..

Finally, plaintiffs' issue regarding its Motion in Limine is moot, because the Summary Judgment was properly granted.

The cost of the appeal is assessed to plaintiffs.

_____
HERSCHEL PICKENS FRANKS, P.J.